**BUHL LAND COMPANY, a Michigan corporation, Plaintiff,**

v.

**Thomas G. KAVANAGH, Adm. of Estate of Giles Kavanagh, Deceased, Defendant.**

No. 7853.

United States District Court
E. D. Michigan, S. D.
June 1, 1954.

Wurzer, Higgins & Starrs, Detroit, Mich., for plaintiff.

Fred W. Kaess, U. S. Atty., and John L. Owen, Asst. U. S. Atty., Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

This is an action for refund of income taxes alleged to have been erroneously assessed and collected. Taxes for several years, beginning with the calendar year 1939, are involved. The complaint is framed in two counts, the first of which seeks recovery of the taxes as well as determination of allowability of tax deductions for carry-back and carry-over purposes; the second count is predicated upon an offer of settlement of these claims, it being the contention of the plaintiff that the offer was accepted but not completed by the Treasury Department and that upon acceptance of the offer plaintiff acquired a right to refund of the amount agreed upon which right became an account stated, binding upon the Treasury Department, including the Commissioner of Internal Revenue and the Collector of Internal Revenue.

Defendant denies plaintiff's right to the relief sought. In separate defenses defendant interposes the bar of the Statute of Limitations as to the claim for refund of 1939 taxes, and satisfaction and payment of the claim for refund of the tax for the calendar year 1942.

### Findings of Fact

1. During the taxable years involved in this suit the plaintiff operated an office building in the City of Detroit known as the Buhl Building from which it derived rental income. Plaintiff always maintained its books and records and submitted its income tax returns under the accrual system of accounting.

2. On July 29, 1925 plaintiff entered into a lease with the Guardian National Bank of Detroit for rental of office space to the bank in the Buhl Building for a term beginning October 15, 1925 and ending October 14, 1935 for a gross rental in said lease, payable in stipulated monthly installments. In addition to rental, the lessee was charged for utilities.

3. The lease contained the following provision:

*Sixth,* that if the Lessee shall become insolvent * * * or if Lessee shall abandon or vacate said premises or any part thereof, before the end of said term, the Lessor is hereby irrevocably authorized, at his option, to forthwith cancel this lease as for a default, and to re-let the premises * * * and if full rental hereinbefore named shall not thus be realized, the said Lessee hereby agrees to pay all deficiency * * * without releasing the Lessee from liability hereunder to pay the full amount of rent hereinbefore reserved to be paid for each month of the term hereby demised.

4. Prior to March 27, 1930, the lessee's interest in said lease was assigned to the Guardian National Bank of Commerce of Detroit.

5. The lessee by assignment, on March 27, 1930, sublet a portion of the leased premises to H. Hentz & Company for a period which represented the balance of the term in the base lease.

6. In March 1933 the lessee by assignment was subjected to appointment of a Conservator and later to the appointment of a Receiver, under the laws relating to national banks.

7. By letter dated April 22, 1933 the Conservator notified plaintiff of the repudiation of the base lease and offered to pay such rental as he considered reasonable, on a month to month basis, for such part of the premises as he might make use of.

8. Extended negotiations relating to the lease were carried on by plaintiff and the Conservator-Receiver until August

15, 1933, but no compromise was reached, and on November 23, 1933, the Receiver gave notice of repudiation of the lease.

9. The Conservator and later the Receiver continued to occupy, as space for storage and servicing of office equipment, the portion of the leased premises not covered by the sub-lease. The sub-lessee also continued in possession.

10. On December 1, 1933 plaintiff re-entered the premises, after previous notice of intention to re-enter and to hold the Receiver liable for damages for breach of the lease, plaintiff claiming such right under the terms of the lease.

11. During 1933, 1934 and 1935 plaintiff continued to accrue on its books the rental reserved under the base lease and included such accruals as gross income in its income tax returns for those years, but despite inclusion of the rent accruals as income, the returns reported net losses upon which no tax was owing.

12. In April, 1934, suit was filed by plaintiff against the Receiver in the state court, which was later removed to the federal court, to recover accrued rents and charges as follows:

COUNT I
Unpaid accruals under the lease up to date Conservator was appointed on March 13, 1933. $ 3,171.96
COUNT II
Use and occupancy of premises by Conservator-Receiver for period from March 13, 1933 to November 30, 1933. 35,881.89
COUNT III
Rental for period from December 1, 1933 to October 14, 1935 at rental rate provided in lease. 87,715.15
$126,769.60

The Receiver, in his amended answer to the complaint, denied any liability under Counts I and III; he admitted liability under Count II only for his use and occupancy of the premises for the period from March 13 to November 30,

1933, but placed in issue the reasonable value of such use and occupancy. This litigation was terminated in 1939 upon payment to plaintiff by the Receiver of the sum of $68,750 in full settlement of all sums due. Each party to this suit released the other from all obligations under the lease.

13. In its 1939 tax returns plaintiff did not include, as income, any part of the $68,750 received in the settlement but deducted the sum of $56,809.19 as a "bad debt" deduction. This sum represented the difference between the rent accruals of $125,559.19 and the amount of $68,750 received in settlement.

14. Upon audit of the return the Commissioner of Internal Revenue added the sum of $68,750 received in settlement, to plaintiff's gross income for 1939 and disallowed the bad debt deduction of $56,809.19, and thereupon assessed an income tax against plaintiff in the sum of $9,727.76 and interest of $1,197.71. The tax and interest were paid by plaintiff on April 8, 1942, and a claim for refund thereof was filed on February 11, 1946.

15. In its 1940 tax returns plaintiff deducted a net operating loss carryover from 1939 in the sum of $56,244.60, arising out of the lease transactions above mentioned. Upon audit of the 1940 return the Commissioner of Internal Revenue disallowed the net operating loss carry-over from 1939 and assessed an income tax against plaintiff which was paid with interest. A claim for refund thereof was timely filed.

16. In its 1941 tax return plaintiff deducted a net operating loss carry-over from 1939 of $12,532.08, arising out of the lease transactions above mentioned. The Commissioner of Internal Revenue, upon audit of the return, disallowed this deduction and assessed income taxes for 1941 against plaintiff which were paid, with interest, and for which a claim for refund was timely filed.

17. In 1943 plaintiff suffered a loss on sale of certain real estate which, under laws applicable to the year 1943, was reported in plaintiff's 1943 tax return

and was allowed in full as an ordinary loss, leaving a net operating loss of $18,-813.50 incurred by plaintiff in that year. In its claim for refund of the 1941 income taxes plaintiff asserted, as an alternative basis for refund, that it was entitled to carry-back and deduct, in 1941, its net operating loss for 1943. The Commissioner, in rejecting the claim for refund of 1941 taxes, recognized that the law in effect in 1943 applied in computing plaintiff's 1943 tax liability but that the 1941 law controlled insofar as computation of plaintiff's 1943 net operating loss allowable as a carry-back to 1941.

18. Under revenue laws applicable to the year 1941, the loss incurred by plaintiff on sale of real estate, if it had occurred in 1941, would be a capital loss and not an operating loss. By application of the law in effect during 1941, plaintiff would not have a 1943 net operating loss which could be carried-back to and deducted in 1941; application of law in effect in 1943, in computing plaintiff's 1943 net operating income (or loss) for carry-back purposes, would result in a 1943 net operating loss which could be carried back to and deducted in 1941 and would then be absorbed by exempt income of $13,726.11 received by plaintiff in 1941, leaving a net operating loss deduction of $5,087.49 for 1941, to be off-set against 1941 net income.

19. In February 1933 plaintiff had $177,494.40 on deposit in the First National Bank of Detroit. The bank closed in February 1933 and a Receiver was appointed to liquidate its affairs. Dividends were periodically paid to depositors, including plaintiff, and by 1940 the depositors received dividends totalling 100% of the face value of their impounded deposits.

20. It is conceded by both parties that under Michigan law the depositors were also entitled to interest on their impounded funds, if assets remained after repayment of the principal amount of the deposits and after payment of certain expenses and allowance of claims, and that the interest was computable on the unpaid balance of the impounded deposits. When so computed, the interest payable amounted to 12.8% of the principal amount of deposits.

21. In 1942, under a plan approved by the Comptroller of Currency, depositors could elect to receive a final dividend of 7.565% in cash or accept participating certificates issued by the First Liquidating Corporation, entitling holders thereof to receive, upon liquidation of the property to be acquired by the First Liquidating Corporation, an amount not exceeding 12.8% of their impounded deposits. Pursuant to this plan plaintiff elected to, and did receive in 1942, participating certificates of the fair market value of $22,719.28.

22. Plaintiff did not accrue, as income, interest on the impounded deposits during any of the years 1933 to 1940, inclusive, nor did it report such interest as income in its tax returns. According to the testimony of a witness for plaintiff the accruals were not made on plaintiff's books because there was no way of knowing what the interest would be, the information was not available to plaintiff, and "there were no interest rates published."

23. On December 1, 1943, an amended tax return was filed by plaintiff for the calendar year 1940, to include $1,-478.26 of the total sum of $22,719.28 interest, claimed by plaintiff to have accrued during 1940. In a schedule attached to the amended return it was stated that the claim-holder certificates did not represent income for 1942 but were merely evidences of indebtedness which accrued over the period from 1933 to 1940, inclusive. Amended returns were not filed for the years 1933 to 1939, inclusive, on the theory that none could be filed under applicable statutes of limitations.

24. Plaintiff did not report as income in its tax return for 1942 the sum of $22,719.28 as interest received from the First Liquidating Corporation. The revenue agent's report for 1942 charged plaintiff with this additional income but no deficiency was assessed against plaintiff for 1942 because of a loss carry-back

from the calendar year 1944 which off-set plaintiff's tax liability for 1942 and entitled plaintiff to a refund of taxes of $7,384.48 paid by plaintiff for that year.

25. The Commissioner thereafter allowed $7,384.48 as an over-assessment for the year 1942 and adjusted this amount by crediting $1,806.36 as interest on the unassessed deficiency in the 1942 tax. The balance of $5,578.12 with interest of $1,463.17 was refunded to plaintiff on February 28, 1939, and a check for the full sum of $7,041.29 remains in plaintiff's possession, pending decision in this suit.

26. While plaintiff's claims for refund of the various income taxes were pending before the Technical Staff of the Bureau of Internal Revenue, an agent of the Bureau signed an Acceptance of Proposed Over-assessment (Treasury Form 873) submitted by plaintiff and notified plaintiff by letter that a portion of the claims for refund would be allowed and others disallowed; thereafter plaintiff was again notified by the same agent, by letter, that the claim for refund of the 1939 taxes was barred by the Statute of Limitations and that, consequently, all the claims for refund would be disallowed.

### Issues Presented

1. Did plaintiff properly accrue, as income in the years 1933, 1934 and 1935, the rentals in the amount of $125,559.19 reserved to plaintiff as Lessor in the base lease?

2. Upon settlement of the suit for recovery of accrued rentals of $125,559.19 for $68,750 was the balance of the accruals in the sum of $56,809.19, deductible as a "bad debt" in plaintiff's income tax return for 1939?

3. Was the claim for refund of 1939 income taxes and interest filed within the statutory time? Plaintiff claims the seven year special period of limitation applies with respect to bad debts under Section 322(b) (5) of the Internal Revenue Code, 26 U.S.C.A., while defendant urges that the two-year period after payment of tax applies, under Section 322(b) (1).

Since the trial plaintiff conceded in its briefs that the seven-year Statute of Limitations applies only to that portion of the 1939 taxes, if any, that can be recovered as a result of a "bad debt" deduction, but not to items included in the claim for refund other than "bad debt" deductions.

4. Can the loss sustained by plaintiff in 1943 be carried-back and deducted by plaintiff as a net operating loss in 1941?

In reliance upon the decision in Commissioner of Internal Revenue v. Moore, Inc., 5 Cir., 151 F.2d 527, the Commissioner refused to allow plaintiff a deduction for the carry-back of a 1943 net-operating loss, contending that in computing the amount of the 1943 net-operating loss which could be carried back to 1941, the provisions of law applicable in the latter year governed. Plaintiff contends the 1943 provisions of the law are applicable. Subsequent to the commencement of this action, however, the decision cited was overruled by Reo Motors, Inc., v. C. I. R., 338 U.S. 442, 70 S.Ct. 283, 94 L.Ed. 245, where it was held that for carry-back purposes, the loss must be computed according to the law applicable to the year in which the loss was suffered. In the light of the latter decision, defendant conceded in post-trial briefs that plaintiff should be permitted a deduction in the year 1941 for its 1943 net-operating loss which will be in the amount of $5,087.49 after necessary adjustments have been made. Allowance of such deduction will result in a refund to plaintiff for the year 1941 in the amount of $1,082.07, plus interest thereon as provided by law.

5. Was the item of interest of $22,719.28, received by plaintiff in 1942 from the First Liquidating Corporation, includible in plaintiff's taxable income for that year, or did such interest accrue as income, taxable to plaintiff in prior years?

6. If the Commissioner properly determined that there was a deficiency in

plaintiff's 1942 income tax, but such deficiency was not assessed due to the effect of a 1943 and/or 1944 carry-back, may interest be assessed on such determined but unassessed deficiency?

Plaintiff conceded in briefs, filed after trial, the right of defendant to charge interest on an assessed valid deficiency, but claims there must be a valid deficiency first established.

7. Did an "account stated" arise as a result of the settlement agreement between plaintiff and the Internal Revenue Department covering plaintiff's tax liability and tax refund claims involved in this suit and, if an "account stated" did arise, may a suit thereon be maintained, in this court, in any event, against the present defendant whose intestate was not a party to the agreement?

In its briefs, filed after trial, plaintiff now concedes the correctness of defendant's contention that the Acceptance of Proposed Over-assessment did not become a final "agreement" within the meaning of Section 3760(b) of the Internal Revenue Code and that a suit on an "account stated" can only be maintained in the U. S. Court of Claims, and only after a Certificate of Over-assessment has been delivered to the taxpayer. See Bonwit Teller & Co. v. United States, 283 U.S. 258, 51 S.Ct. 395, 75 L.Ed. 1018.

### Discussion

■ The essence of the accrual method of keeping accounts and making tax returns is that the right to receive and not the actual receipt determines whether an amount should be included in gross income. The right accrues when the right to receive the amount becomes fixed. Ohmer Register Co. v. Commissioner of Internal Revenue, 6 Cir., 131 F.2d 682, 143 A.L.R. 1164, citing Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184, 54 S.Ct. 644, 78 L.Ed. 1200.

■ The principle as to necessity of a fixed right to receive a reasonably ascertainable amount to establish accrued income has its counterpart in the necessity of a fixed liability to pay an ascertainable amount to support an accrued deduction from gross income. Where the claim remains in dispute, both as to liability and amount, until final settlement is reached on a disputed claim for damages, there is no fixed right to receive payment in any amount, and there can be no account receivable accruable in income of a taxpayer for tax purposes. Apex Electrical Mfg. Co. v. Commissioner of Internal Revenue, 16 T.C. 1171, affirmed per curiam 6 Cir., 202 F.2d 151.

■ Whether a taxpayer is entitled to accrue income depends upon whether he then has and is justified in having a reasonable expectation that payment will be made in due course. Events of later years rendering doubtful collection of an obligation are not relevant to the propriety of accruing the obligation as income of an earlier year. Automobile Ins. Co. of Hartford, Conn. v. Commissioner of Internal Revenue, 2 Cir., 72 F.2d 265.

These principles must be applied in resolving the first issue presented for determination here. The total accruals of $125,559.19 included by plaintiff in its tax returns for 1933, 1934, 1935 included the items which form the basis of the three separate counts in the complaint filed against the Receiver: (a) Rent and utility charges from March 1, 1933 to date of appointment of the Conservator; (b) rent during use and occupancy by Conservator-Receiver and the bank's sub-tenant; and (c) rents for the balance of the unexpired term of the lease. At the time each of these items was accrued, did plaintiff have a fixed right to receive a reasonably ascertainable amount to establish accrued income, for income tax purposes?

Before insolvency of the bank plaintiff had a fixed right to receive a definite amount of rent and utility charges from the bank. It could and did file a claim for the amount due up to the time of insolvency. The insolvency and possibility that the claim might not be recovered in full is not relevant to the propriety of accruing the full amount. The Receiver denied that the bank was indebted

to plaintiff on this Count in the complaint but this fact, alone, would not render either the fact or the amount of the liability so uncertain as to make accrual unwarranted.

The Receiver, by virtue of his appointment and entering into possession of the leased premises, did not become assignee of the lease, liable on its covenants, but was entitled to a reasonable time in which to elect whether to adopt or reject the lease, depending on whether, in his opinion, it would or would not be profitable or desirable to adopt the lease. See Annotation, 43 A.L.R. 727. Obviously, the Receiver deemed it neither profitable nor advisable to continue paying $4,120.-70 monthly for occupying one-third of the space covered by the lease, to be used by him for storage and servicing of office equipment, when the sub-tenant would pay only $1,875 and later $2,083.33 for use of two-thirds of the space. But the Receiver continued in possession of the premises for a period of several months after his appointment, and the sub-tenant also remained in possession for the same period of time. He admitted liability to plaintiff for use and occupancy during that period but challenged reasonableness of the amount of rent.

The basis of compensation to be paid a lessor by a receiver where he does not adopt the lease has generally been held to be, not the rent stipulated in the lease, but the reasonable value of the use and occupation of the leased premises. But the correct method of computing such compensation is often immaterial, as the reasonable value of the use and compensation is ordinarily measured by the stipulated rent, unless shown to be unreasonable. See Annotation 43 A.L.R. 734. Under the circumstances in this case, where the sub-lessee also remained in possession and was financially responsible for almost 50% of the rental, plaintiff could be reasonably certain that the full amount claimed by it for rents, during use and occupancy by the Conservator-Receiver and the sub-tenant, could be collected. Since the liability of the Receiver was not only established, but conceded, and the amount was reasonably ascertainable, plaintiff properly accrued this portion of the rents on its books and reported it in its income tax return for 1933.

As to rents accrued by plaintiff after re-entry, plaintiff maintains that accruals in the sum of $87,715.75 from December 1, 1933 to October 14, 1935, were justified because the Receiver's liability to pay this amount was legally established under the law. For the right to make these accruals plaintiff relied upon the case of Leo v. Pearce Stores Co., D.C., 54 F.2d 92, an equity receivership suit filed on behalf of all creditors for conservation and distribution of an insolvent company's estate. The district court applied Michigan law, following the ruling in McGraw v. Union Trust Co., 135 Mich. 609, 98 N.W. 390, which case involved a state bank receivership. The Michigan Supreme Court recognized that a lessor has a right to recover his damages for loss of future rents in accordance with the terms of his lease where the premises are vacated because of insolvency of the lessee and appointment of a receiver, and this notwithstanding the absence of a provision in the lease for acceleration, indemnity or liquidated damages in case of default.

The Receiver, on the other hand, challenged applicability of local law on the ground that plaintiff's claim was being asserted against him as a Receiver winding up the affairs of a national bank, that the National Bank Act established an exclusive system for the administration and liquidation of insolvent national banks, and the determination of the validity of any claim presented involved a federal statute and not local law. The Receiver advanced the same argument in similar cases then pending against him and prevailed on this theory in the case of Dinan v. First National Bank, 6 Cir., 117 F.2d 459, 461, decided after plaintiff settled his claim with the Receiver. In the last cited case the court held that a lessor's rights and the manner of enforcement thereof, after the bank's default by repudiation of a

lease on the part of the bank's conservator, are attributable to and derived from the federal statute requiring the Comptroller of Currency to pay ratable dividends on all proved or adjudicated claims against the bank, though it leaves their extent and circumstances of their enforcement to judicial determination. The lessor, according to that court, is not entitled to recover damages from a receiver for breach of an executory contract, at least in "the absence of a provision in the lease for acceleration indemnity or liquidated damages in case of default." The McGraw case is discussed in the opinion of the court.

■ The lease between plaintiff and the Receiver, in Par. 6, contained the provision for payment of the difference between the rent paid each month by a new tenant and the rent reserved in the lease. The construction to be placed on that provision, as affecting liability of the Receiver for damages or future rents, also was not certain at the time the accruals were made. In the case of Chicago Title & Trust Co. v. Fox Theatres Corp., D.C., 14 F.Supp. 686, thereafter decided, the court passed upon a similar provision in a lease covering property situated in Michigan. The court determined that though damages, as provided by the lease, would be provable against an insolvent estate of a lessee, if the lease had provided that damages be paid in a lump sum, consisting of the difference between the rent reserved for the balance of the term and the rental value of the premises at the time of the breach of the lease, this rule is not applicable where the lease provided for payment of damages in such sums as might be determined from time to time as the difference between the rent reserved and the rental value of the premises at different times during the balance of the term. See Annotation, 111 A.L.R. 556.

■ As to the portion of accruals made after re-entry by plaintiff-lessor the liability of the Receiver was not fixed or legally established, as contended by plaintiff; his liability was not fixed until 1939 when the settlement agreement fixed such liability, and any sums recovered on this claim were then reportable as income. No income in this respect accrued, however, in years prior to 1939 and accruals during 1933, 1934 and 1935 were improperly made. Plaintiff itself obviously doubted its ability to prevail on its entire claim since it settled the claim in full for less than 60% at a time when some other claimants realized 89.5% of their claims.

■ Under Section 3772(a) (1) of the Internal Revenue Code, 26 U.S.C.A., no action may be maintained for the recovery of any internal revenue tax alleged to have been erroneously assessed or collected unless a claim for refund or credit has been duly filed with the Commissioner, according to the provisions of law in that regard. Although plaintiff may have had a valid claim for refund of 1939 taxes, based on inclusion by the Commissioner of items in gross income which were properly reported in prior years, such claim for refund was filed more than three years after the 1939 tax return was filed and more than two years after the tax paid, hence the claim is barred by the statute [See Section 322(b) (1)] and no action may be maintained thereon.

The sum of $22,719.28 paid to plaintiff by the Receiver in 1942 represented interest for the years 1933 to 1940 on impounded funds belonging to plaintiff. The Receiver was under an obligation to pay interest upon impounded funds but only if funds were available after repayment of the principal amount of the deposits and after payment of other allowed claims. At no time prior to 1942 did plaintiff accrue any interest on its books and only in 1942, when the full amount of $22,719.28 was received, did it file an amended tax return for 1940 and include therein the small portion which it contends was taxable as income for that year. No accruals were made from 1933 to 1940 because plaintiff did not know how much interest, if any, would be paid; it did not know, in fact, during part of this period of time,

whether the principal sum of the impounded funds would be paid in full.

If the right to receive income is contingent, there can be no accrual of income. United States v. Safety Car Heating & Lighting Co., 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500; Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668. Furthermore, no income accrues to a creditor if there is a reasonable and substantial doubt as to the collectibility of the item. Corn Exchange Bank v. United States, 2 Cir., 37 F.2d 34; O'Sullivan Rubber Co. v. Commissioner of Internal Revenue, 42 B.T.A. 721; Great Northern Railway Co. v. Commissioner of Internal Revenue, 8 B.T.A. 225.

The Receiver's liability to pay interest was contingent and even when it appeared that funds for payment of interest would be available, the amount that would be paid was unascertainable. Plaintiff realized income in the sum of $22,719.28 when this sum was received, at which time liability of the Receiver was fixed and the amount thereof became ascertainable. No income accrued to plaintiff during 1933–1940, as claimed. To hold otherwise would prevent taxability of interest to persons whose funds were impounded because during the taxable years for which interest is eventually paid, it could not be determined whether any interest would ever be paid, or if paid, in what amount; and when the amount could be determined, allocation of the fund back to such years would preclude collection because of the running of the statutory period for collecting additional taxes for the prior years. In the present case plaintiff would be taxed on $1,478.26 of a total of $22,719.28 actually received, and the balance would be immune from taxation, if plaintiff prevailed.

## Conclusions of Law

1. Income accrued to plaintiff during 1933 in the sum of $39,053.85 which it properly reported in its income tax return for that year. Liability of the Receiver on plaintiff's claim in that amount for rental and utility charges from March 13, 1933 to November 30, 1933, was fixed and the amount of such liability was reasonably ascertainable.

2. No income accrued to plaintiff from December 1, 1933 to date of expiration of the lease between plaintiff and the bank, either as rent or as damages for breach of the lease. Prior to 1939 a controversy existed as to the liability of the Receiver, if any, for such rent or damages, and the liability of the Receiver thereon was not fixed or legally established until 1939 when it became fixed by the settlement agreement between plaintiff and the Receiver.

3. The Commissioner of Internal Revenue erred in including the full sum of $68,750 received in such settlement in 1939, in plaintiff's gross income for that year, as $39,053.85 of that amount had been previously properly accrued and reported by plaintiff in its income tax returns for prior years; the balance of the settlement payment was reportable by plaintiff as income for 1939.

4. The sum of $87,715.75 was improperly accrued by plaintiff as income from December 1, 1933 to October 14, 1935, for rents or damages for breach of lease, as no income accrued to plaintiff in this amount.

5. Plaintiff was not entitled to a bad-debt deduction of $56,809.19 in 1939 as the difference between the total accruals under the lease and the sum received in settlement. The Commissioner of Internal Revenue, therefore, properly disallowed such deduction in 1939.

6. Although plaintiff had a valid claim for refund of taxes for the year 1939, due to improper inclusion of the sum of $39,053.85 by the Commissioner in plaintiff's income for that year, plaintiff's claim for refund, based upon improper inclusion of items in income, was not filed within the time allowed by law for filing such claims and plaintiff is not entitled to recovery of any taxes for 1939.

7. Since plaintiff was not entitled to claim a bad-debt deduction in 1939, resulting from the lease transactions with the bank and its Conservator-Receiver, it improperly carried over a portion of such loss, as a net-operating loss, to the year 1940. The Commissioner therefore properly assessed and collected income taxes for 1940, based on disallowance of the net-operating loss carry-over of $56,-244.60 in 1940.

8. The Commissioner also properly assessed and collected income taxes for 1941, based on disallowance of $12,532.-08 claimed by plaintiff as a net operating loss carry-over from 1939, resulting from the same lease transactions.

 9. In computing plaintiff's deduction in the year 1941 on account of the carry-back of a net-operating loss sustained in 1943, the amount of the 1943 net-operating loss is to be computed in accordance with the revenue laws applicable for 1943.

10. In computing its 1941 income tax liability, plaintiff is entitled to a deduction in the amount of $5,087.49 on account of the carry-back of its 1943 net-operating loss.

11. The Commissioner of Internal Revenue improperly refused to allow a deduction to plaintiff of the said sum of $5,087.49 in 1941.

12. Plaintiff is entitled to a refund for the year 1941, in the amount of $1,-082.07 and interest from date of payment, based upon the allowance of the foregoing $5,087.49 deduction.

13. Prior to 1942 no income accrued to plaintiff from interest on plaintiff's impounded deposits in the First National Bank of Detroit.

14. The sum of $22,719.28 received by plaintiff in 1942 from the First Liquidating Corporation of Detroit was includible in plaintiff's gross income for the calendar year 1942, and the Commissioner of Internal Revenue properly determined a deficiency in income tax against plaintiff for that year, based upon inclusion of the foregoing $22,719.28 in plaintiff's gross income for 1942.

15. Even though the deficiency so determined was not assessed, due to the effect of a 1944 loss carry-back to which plaintiff was then entitled, interest on such deficiency was properly assessed and collected in the amount of $1,806.36.

16. Plaintiff cannot maintain this action against the defendant on the theory of an account stated and the second count of the complaint based on an account stated, is, therefore, dismissed.

Judgment, for plaintiff, in the sum of $1,082.07 and interest from date of payment of additional income taxes assessed against plaintiff for 1941, is being filed herewith.